**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-0454-WJM-KLM

WESTERN CAPITAL PARTNERS LLC, a Colorado Limited Liability Company,

     Plaintiff,

v.

FIRST AMERICAN TITLE INSURANCE COMPANY, a California Corporation,

     Defendant.

---

## ORDER DENYING DEFENDANT'S EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT

---

     Plaintiff Western Capital Partners, LLC brings this action against Defendant First American Title Insurance Company related to coverage under an insurance policy issued by Defendant.  (ECF No. 67.)  This matter is before the Court on Defendant's Early Motion for Partial Summary Judgment ("Motion").  (ECF No. 35.)  For the reasons below, the Motion is denied.

## I.  BACKGROUND

     The following relevant facts are undisputed, unless otherwise noted.  On June 15, 2007, Plaintiff made a $13,065,000 loan ("the Loan") to three borrowers:  Montana Specs, LLC, GoBuild, Inc., and Blue Sky Development, LLC ("the Borrowers").  (ECF No. 42 at 4.)  As partial security for the Loan, Plaintiff received a commercial promissory note from the Borrowers and another entity, Monarch GoBuild Construction, LLC.  (ECF No. 42-2.)  Edra Blixseth owned Monarch Design, LLC, which in turn owned a 45% share of Monarch GoBuild Construction, LLC.  (ECF No. 42 at 7.)  Monarch GoBuild

Construction, LLC owned a piece of property referred to as Lot 176.  (*Id*.)  Before the

Loan closed, Monarch GoBuild Construction, LLC executed a quitclaim deed of Lot 176

to one of the Borrowers, Montana Specs, LLC.  (*Id*.)  Blixseth thereafter retained no

further interest in Lot 176.  (*Id*.)  As further security for the Loan, the Borrowers granted

Plaintiff a mortgage ("the Mortgage") on Lot 176, and Blixseth executed a personal

guaranty of the Loan.  (*Id*. at 4.)  On June 19, 2007, Plaintiff obtained a title insurance

policy ("the Policy") from Defendant that covered Lot 176 and included a Creditors'

Rights Endorsement ("the Endorsement").  (ECF No. 1-1.)  Plaintiff assigned its interest

in the Mortgage to a third party on January 24, 2008.  (ECF No. 35 at 5.)

On March 26, 2009, Blixseth filed a voluntary Chapter 11 bankruptcy petition in

the United States Bankruptcy Court for the District of Montana, and her case was

converted to a Chapter 7 proceeding on May 29, 2009.  (ECF Nos. 42 at 8; 42-6 at 28.)

The bankruptcy Trustee filed an Adversary Proceeding against Plaintiff requesting that

"every transfer made for the benefit of [Plaintiff] be avoided" as constructively fraudulent

under 11 U.S.C. § 548(a)(1)(B), including Blixseth's personal Loan guaranty and all

transfers of property to Plaintiff in connection with the Loan.  (ECF No. 42-8 at 25.)

Among the relief sought by the Trustee was a judgment against Plaintiff related to the

transfer of Lot 176 from Monarch GoBuild Construction, LLC to Montana Specs, LLC

for the benefit of Plaintiff in securing the Loan.  (ECF No. 42-6 at 62.)

On March 18, 2013, the bankruptcy court ultimately found that Blixseth's

guaranty of the Loan was constructively fraudulent under 11 U.S.C. § 548.  (*Id*. at 61.)

The court found that Plaintiff had foreclosed on Lot 176 at some point following the

issuance of the Mortgage, and sold the property for approximately $5.6 million.  (*Id*. at 49.)  The court further found that, had Blixseth retained her interest in Lot 176, she would have earned $1,258,949.27 through the property's sale, and accordingly entered judgment against Plaintiff in that amount.  (*Id*.)

Prior to the issuance of the bankruptcy court's judgment, on June 14, 2012, Plaintiff notified Defendant of the Adversary Proceeding against it, the Trustee's challenge to Plaintiff's interest in Lot 176, and Plaintiff's belief that the Policy covered such claims.  (ECF Nos. 35 at 5 & 35-5.)  Defendant denied Plaintiff's claim.  (ECF No. 35 at 6.)  Plaintiff initiated this action on February 21, 2014 seeking a declaratory judgment on the issue of coverage under the Policy, and asserting claims for bad faith failure to settle and breach of contract.  (ECF No. 1.)  In its Motion, Defendant seeks summary judgment on the declaratory judgment and breach of contract counts of Plaintiff's operative Complaint.  (ECF No. 35.)

## II.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute regarding a material fact depends upon whether the evidence presents a sufficient disagreement as to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

3

A fact is "material" if it pertains to an element of a claim or defense, and a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party. *Anderson*, 477 U.S. at 248.  The Court must examine the facts in the light most favorable to the nonmoving party, and resolve factual ambiguities against the moving party. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).  The summary judgment standard thus favors a right to trial. *See id.*

### III.  ANALYSIS

**A.      Choice of Law**

The Court must first determine what law applies to the resolution of Plaintiff's claims, and to the interpretation of the Policy.  Federal courts sitting in diversity apply the forum state's choice of law principles. *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131,1143 (10th Cir. 2009).  Colorado courts "apply the law chosen by the parties unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." *Target Corp. v. Prestige Maint. USA, Ltd.*, 2013 WL 363324, at *2 (Colo. App. Jan. 31, 2013) (citing *Hansen v. GAB Bus. Servs., Inc*., 876 P.2d 112, 113 (Colo. App. 1994)).

Here, the Policy contains a choice of law provision that states that Plaintiff acknowledges Defendant "has underwritten the risks covered by this policy . . . in reliance upon the law affecting interests in real property . . . where the land is located. Therefore, the court . . . shall apply the law of the jurisdiction where the land is located

4

. . . to interpret and enforce the terms of this policy." (ECF No. 1-1 at 4.)  Lot 176 is

located in Montana.  (ECF No. 35 at 7.)  The Court thus finds that the parties had a

reasonable basis for selecting Montana law.  *See Prestige Maint. USA, Ltd.*, 2013 WL

363324, at *2.  Although Plaintiff applies Colorado law in its briefs, it does not address

the choice of law provision, or state why Montana law would be contrary to the

fundamental policies of Colorado.  (*See* ECF No. 42.)  The Court will therefore interpret

the Policy under Montana law.

**B.    Interpreting the Policy**

The interpretation of insurance contracts is a question of law.  *Steadele v.

Colony Ins. Co.*, 260 P.3d 145, 149 (Mont. 2011) (citation omitted).  Under Montana

law, courts apply general rules of contract interpretation to insurance policies, and

strictly construe policies against the insurer and in favor of the insured.  *Id.*  Courts must

interpret a policy's terms "according to their usual, common sense meaning as viewed

from the perspective of a reasonable consumer of insurance products."  *Id.*  Exclusions

are to be strictly and narrowly construed because they are "contrary to the fundamental

protective purpose of an insurance policy."  *Id.*  Similarly, all ambiguities are resolved in

favor of coverage.  *Id*.

1.    The Applicability of the Policy's Exclusion

Defendant argues that the Policy does not provide coverage for the judgment

against Plaintiff in the bankruptcy proceeding.  (ECF No. 35.)  The Policy provides that

"[t]he voluntary satisfaction or release of the Insured Mortgage shall terminate all liability

of the Company except as provided in Section 2 of these Conditions."  (*Id*. at 3.)

Plaintiff's January 24, 2008 assignment of its Mortgage on Lot 176 states that Plaintiff "does hereby sell, assign, transfer, and set over . . . [its] interest in [the Mortgage] . . . including any amendment or modification thereto, together with all right and interest in the land herein described . . . ."  (ECF No. 35-2.)  Plaintiff's contention that the assignment was only a "collateral assignment" intended to secure certain repayment obligations to the assignee is unavailing.  (ECF No. 42 at 22.)  The assignment unambiguously conveys "*all* right and interest" in the Mortgage.  Therefore, Defendant argues that Plaintiff's assignment terminated Policy coverage pursuant to the exclusion.  (ECF No. 35 at 2-3.)  However, it is unclear whether the exclusion applies under these circumstances based on the date that the Policy coverage was triggered.

*Countrywide Home Loans, Inc. v. United General Title Insurance Company*, 109 A.D.3d 950, 950 (N.Y. App. 2013) is instructive.  In *Countrywide*, the plaintiff granted a borrower a mortgage loan that was secured by property located in New York.  *Id*.  The plaintiff obtained a policy of title insurance for the transaction.  *Id*.  Shortly thereafter, the plaintiff learned that the borrower had falsified his identity, prompting the plaintiff to execute a satisfaction of its mortgage and release of its lien on the property.  *Id*.  The plaintiff then made a claim under its title insurance policy, and the insurer disclaimed coverage based on an exclusion that voided coverage upon assignment of the insured mortgage.  *Id*. at 951-52.

The court held that the assignment exclusion did not apply.  *Id*. at 952.  The court found that the plaintiff held a mortgage based on forged documents that rendered it "invalid and unenforceable *ab initio*."  *Id*.  Therefore, the plaintiff's loss due to the

6

mortgage's invalidity "arose prior to the plaintiff's execution of the satisfaction of mortgage, which was of no effect and did not invoke the termination and settlement conditions of the policy." *Id*.

As in *Countrywide*, the bankruptcy court here found that Plaintiff's interest in Lot 176 was fraudulent as of the date of the conveyance under 11 U.S.C. § 548.  (ECF No. 42-6 at 61.)  Section 548 is a lookback provision that gauges whether a transaction was actually or constructively fraudulent on the date it was entered into.  "If the debtor so transfers an asset, the Trustee may avoid the transaction and reclaim the relinquished asset.  The transferee must surrender the property or provide the bankrupt's estate with the asset's cash equivalent."  *Pfister v. Architectural Glass Const., Inc.*, 749 F.3d 294, 297 (4th Cir. 2014).  Plaintiff incurred fraudulent transfer liability because the bankruptcy court found, in part, that Blixseth had not received the appropriate value for her transfer of Lot 176 and that she was insolvent on the date of the transfer.  (ECF No. 42-6 at 50, 56).  Based on the bankruptcy court's findings, Plaintiff's loss arose at the time of the fraudulent transfer prior to its assignment of the Mortgage.

Moreover, the Endorsement, like § 548, is retroactive.  The Endorsement provides coverage for any fraudulent transfer that occurs "on *or before* [the] Date of Policy."  (ECF No. 35 at 4) (emphasis added).  Because the Policy was issued after Plaintiff obtained the Mortgage, the Endorsement retroactively covered any fraudulent transfer liability that Plaintiff had incurred, regardless of any post-loss assignment.  (*Id*. at 3.)  Therefore, the Court finds that because Plaintiff's loss occurred at the moment Lot 176 was transferred, the Policy was in force at the time of the loss and was not voided by any subsequent assignment.

7

2.      The Applicability of the Exclusionary Exception

Even if the Court were to accept Defendant's argument that the exclusion

applies, the Policy contains an exception to the exclusion.  Once the insurer meets its

burden of proving that an exclusion applies, the burden shifts to the insured to prove

that an exception to the exclusion exists.  *Travelers Cas. & Sur. Co. v. Ribi*

*Immunochem Research, Inc*., 108 P.3d 469, 476 (Mont. 2005).  The exception to the

exclusion found in Section 2, "Continuation of Insurance," states in relevant part:  "The

coverage of this policy shall continue in force as of Date of Policy in favor of an Insured

after acquisition of the Title by an Insured or after conveyance by an Insured, but only

so long as the Insured retains an estate or interest in the Land . . . ."  (ECF No. 35 at 3.)

Neither "estate" nor "interest" is defined in the Policy.  (*See* ECF No. 1-1.)  Therefore,

the Court must further determine whether Plaintiff has proven that the Policy's exclusion

exception applies.

An ambiguity exists where an insurance policy is subject to two different

interpretations.  *Colony Ins. Co.*, 260 P.3d at 149.  Indeed, Plaintiff and Defendant

attach two separate meanings to the word "interest" as used in Section 2, and the Court

finds that the term is subject to more than one interpretation.  (*Compare* ECF No. 42 at

20, *with* ECF No. 51 at 9.)  In such cases, "the construction most favorable to the

insured . . . must prevail, particularly if an ambiguous provision attempts to exclude the

liability of the insurer."  *Pablo v. Moore*,  995 P.2d 460, 463 (Mont. 2000).  Moreover,

Defendant, "having declined to define the term [in the Policy], is not well-positioned to

argue that the term is only capable of the one interpretation."  *Id*. at 462.  With these

8

principles in mind, the Court must therefore give meaning to the term "interest" as used in the "Continuation of Insurance" portion of the Policy.

In the context of an insurance policy, the Court finds that the term "interest" as used in the Policy is akin to an "insurable interest," and that the common law definition of "insurable interest" is thus relevant here.[1]  Montana common law broadly defines "insurable interest."  "An insurable interest need not be an ownership or possessory interest.  Rather, any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss." *Lincoln Cnty. Port Auth. v. Allianz Global Risks U.S. Ins. Co.*, 315 P.3d 934, 946 (Mont. 2013) (citations and quotation marks omitted).  Put differently, an insurable interest exists where the insured has such a relationship with the property that he would incur a loss if the property were harmed by the risk against which it is insured. *Bird v. Cent. Mfrs. Mut. Ins. Co.*, 120 P.2d 753, 755 (Or. 1942).  Ascertaining the existence of an insurable interest thus focuses on the potential for economic loss, not ownership of the property producing the loss.  44 Am. Jur. 2d Ins. §§ 926, 938 (2015).

---

[1]  Although Montana law statutorily defines "insurable interest," the statute explicitly excludes application of the definition to title insurance policies.  Mont. Code Ann. §§ 33-15-101(4), 33-15-205.  In Montana, "there is no common law in any case where the law is declared by statute.  But where not so declared, if the same is applicable and of a general nature and not in conflict with the statutes, the common law shall be the law and rule of decision."  Mont. Code Ann. § 1-1-108.  A judge's role in interpreting a statute "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."  Mont. Code Ann. § 1-2-101.  The statute limiting the applicability of the "insurable interest" definition does not purport to preclude reference to the relevant common law, nor does it expressly displace the common law. *See* Mont. Code Ann. § 33-15-101.  Since a statute on a subject governed by the common law "is not presumed to make any alterations in that law further than is expressly declared," the Court finds that the common law definition of "insurable interest" applies to title insurance policies, despite the inapplicability of the statutory definition to such policies. *Pritchard Petroleum Co. v. Farmers Coop. Oil & Supply Co.*, 190 P.2d 55, 62-63 (Mont. 1948).

Defendant argues that the assignment of the Mortgage negated any interest Plaintiff might have had in Lot 176.  (ECF No. 51 at 7-8.)  However, it is apparent that even after assigning its entire interest in Lot 176, Plaintiff was subject to, and incurred, a substantial economic loss related to Lot 176.  The bankruptcy court discussed the transfer of Lot 176 and its impact on Blixseth:

> Rather than elevate form over substance, the Court finds it appropriate to dispense with the structure of the transactions and evaluate the net impact on [Blixseth].  In conjunction with the loan, [Plaintiff] required that Lot 176 be put in a special purpose entity.  As part of that process, [Blixseth] did not object to Monarch GoBuild Construction, LLC transferring ownership of Lot 176 to Montana Specs.  That transfer resulted in [Blixseth], through Monarch Design, LLC, relinquishing her ownership interest in Lot 176.  As calculated earlier, that transfer, done at the request of [Plaintiff], resulted in a loss of $1,258,949.27 to [Blixseth].

(ECF No. 42-6 at 62.)  Plaintiff accordingly held an insurable interest in Lot 176 because the property was harmed by the very risk it was insured against in the Policy's Endorsement, *i.e.* fraudulent transfer liability. *Bird*, 120 P.2d at 755.  Therefore, the Court finds that even if the Plaintiff's assignment of the Mortgage triggered a coverage exclusion under the Policy, the "Continuation of Insurance" exception applied to save coverage.

In light of the foregoing finding, the Court can quickly dispose of a similar argument raised by Defendant.  Defendant argues that, regardless of any applicable exclusion, the Endorsement did not provide coverage for the Trustee's allegations in the Adversary Proceeding.  (ECF No. 35 at 13.)  Defendant maintains that the Trustee challenged Blixseth's personal guaranty, and did not seek to invalidate the Mortgage or

Plaintiff's interest in Lot 176.[2]  (*Id.* at 12.)  The Endorsement states:

> The Company insures against loss or damage sustained by the Insured by reason of the avoidance, in whole or in part, or a court order providing some other remedy, based on the voidability of any estate, interest, or Insured Mortgage because of the occurrence on or before Date of Policy of a fraudulent transfer or a preference under federal bankruptcy, state insolvency, or similar creditors' rights laws.

(*Id.* at 4.)  The plain language of the Endorsement precludes Defendant's narrow interpretation that the Endorsement only covers direct challenges to the Mortgage itself or to some other possessory interest in Lot 176.  Rather, the Endorsement specifically delineates three bases for coverage "based on the voidability of *any estate, interest, or Insured Mortgage*."  (*Id.*) (emphasis added).  As the Court has already held, "interest" is not necessarily restricted to an ownership or possessory interest.  The Court finds that the Endorsement specifically provides coverage for fraudulent conveyance liability, and Defendant has failed to prove that Plaintiff did not hold a covered "interest" in Lot 176.

The Court also rejects Defendant's argument that it "did not agree to insure a loan guaranty or any other transaction by [Plaintiff]" beyond the Mortgage itself.  (ECF No. 35 at 12-13.)  The Endorsement states that it is "issued as part of the policy" and does not "modify any of the terms and provisions of the policy."  (*Id.* at 4.)  However, the Endorsement also states that, "[t]o the extent a provision of the policy . . . is

---

[2]  Defendant ignores that the U.S. District Court for the District of Montana affirmed the bankruptcy court's opinion and noted that "the Trustee requested that *every transfer* made for the benefit of [Plaintiff] be avoided, including the guaranty, the security agreement, and [Blixseth's] voluntary and involuntary transfers of property to [Plaintiff] in connection with those documents."  (ECF No. 42-8 at 25-26) (internal quotation marks omitted) (emphasis added).  "The word 'transfer' has the broadest possible meaning under the Bankruptcy Code.  It includes virtually every conceivable voluntary or involuntary disposition of real or personal property whether direct or indirect."  Ginsberg & Martin on Bankr. § 9.03(c) (2015).

inconsistent with an express provision of this endorsement, this endorsement controls." (*Id.*)  It is therefore irrelevant what the Policy itself insures against; the Endorsement provides coverage for the voidability of any "estate, interest, or Insured Mortgage," and therefore controls.  (*Id.*)  In sum, Defendant has failed to prove that the Endorsement did not cover risks related to Plaintiff's interest in Lot 176.

## IV.  CONCLUSION

For the reasons above, the Court ORDERS that Defendant's Early Motion for Partial Summary Judgment (ECF No. 35) is DENIED.

Dated this 19th day of March, 2015.

BY THE COURT:

William J. Martínez
United States District Judge